UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**JAMES RICHARD OLSEN,**

               Debtor.

Case No.  **13-60733-13**

---

**TIM MEIKLE,**

               Plaintiff.

-vs-

**JAMES RICHARD OLSEN,**

               Defendant.

Adv No.  **13-00032**

## MEMORANDUM OF DECISION

At Butte in said District this 28th day of August, 2014.

In this adversary proceeding the Plaintiff Tim Meikle (hereinafter "Meikle") seeks exception from the Debtor/Defendant James Richard Olsen's ("Olsen") discharge of Meikle's claims for damages or lost profits under 11 U.S.C. §§ 523(a)(2)(A) for fraud, and under § 523(a)(6) for willful and malicious injury.  After trial of this cause and review of the parties' post-trial briefs and the record, this matter is ready for decision.  For the reasons set forth below, judgment shall be entered in Olsen's favor dismissing Meikle's complaint in its entirety.

This Court has exclusive jurisdiction of Olsen's Chapter 13 bankruptcy case under 28 U.S.C. § 1334(a).  This adversary proceeding is related to Olsen's bankruptcy case under 28

1

U.S.C. § 1334(b), and Meikle's claims for relief are core proceedings to determine the dischargeability of Meikle's particular debts under 28 U.S.C. § 157(b)(2)(I).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. Rule 7052 (applying Fed. R.Civ. P. 52 in adversary proceedings).

Trial of this adversary proceeding commenced at Missoula on April 24, 2014, and concluded on May 27, 2014.  Plaintiff appeared and testified, represented by attorney Brian J. Miller of Morrison, Sherwood, Wilson, & Deola, P.L.L.P., of Helena, Montana.  Defendant appeared and testified, represented by attorneys Nik Geranios of Missoula, Montana, and Richard A. Weber of Hamilton, Montana.  Also testifying were forensic accountant Charity Rowsey ("Rowsey"), Dawn Boland ("Boland"), Kiersten Schmidt ("Schmidt"), CPA Thomas E. Copley ("Copley"), and Holly Herring ("Herring").

Plaintiff's Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, and Defendant's Ex. A, B, C, D, E, F, G, H, J, K, L, M, and O were admitted into evidence.  The Court admitted part of Ex. 33 (MMS 66-69), but did not admit pages marked MMS 70-75.  At the conclusion of Plaintiff's case-in-chief the Defendant's attorney moved for entry of judgment under Fed. R. Civ. P. Rule 52(c) (applicable in adversary proceedings under F.R.B.P. 7052).  Defendant argued that the Plaintiff failed to produce evidence of fraudulent intent under § 523(a)(2), and failed to show intent to injure Plaintiff under § 523(a)(6).  Plaintiff's counsel responded that the Court can infer intent under both subsections of § 523(a) from the evidence and totality of the circumstances.  The Court denied Defendant's motion for judgment on partial findings.  After the conclusion of the parties' cases-in-chief the Court

2

granted the parties time to file briefs, which have been filed and reviewed by the Court together with the record and applicable law.

## FACTS & PROCEDURAL HISTORY

**The Parties**.

Tim Meikle is a graduate of the University of Wisconsin with a degree in biology and is a specialist in native plant restoration ("NPR"). He testified that he is a professional ecologist, has published numerous papers and articles on NPR in professional journals and other publications, and also has written grant applications submitted to the United States Department of Agriculture and State of Montana. Meikle developed products related to NPR including container types, a fungi-based growth media named "Vam-Grow" and a landscaping product named "EcoSod." From 1994 to 2006 Meikle was employed by Bitterroot Restoration[1] near Hamilton, Montana, until it closed. Meikle testified that while working at Bitterroot Restoration he earned more than $1 million in state and federal grants.

Debtor/Defendant James Richard Olsen is a businessman with a background as a profit center manager for a large company he identified as Raytheon, where he testified he learned management skills and concepts while managing profit centers. Schmidt and Boland testified that Olsen would talk about being a negotiator in the defense industry. Schmidt testified that Olsen said that he was a "savior" of projects. Olsen rose to program manager and director for large defense programs while at Raytheon, and after he left Raytheon he continued as a consultant.

Olsen owns a Delaware close corporation called Human Interactive Products, Inc.

---

[1]Bitterroot Restoration operated greenhouses selling living plants.

("HIPinc"), of which he is majority shareholder, president and officer.  He started HIPinc in software development, and later did consulting for Raytheon.

HIPinc developed into a "business incubator," or what Olsen described as "internal profit centers."  Olsen has written on the concept of business incubators, which he described as enterprises or profit centers formed within a company, which are "bootstrapped" using loans or profits borrowed from other enterprises in the same company.  HIPinc developed profit centers under written contracts with small businesses.

Olsen testified that all companies have profit centers, which are separate divisions within a company.  He explained that one individual is put in charge of each profit center and held accountable and individually responsible to make a profit, so the company could keep track of how each manager was doing.  HIPinc opened checking accounts for its profit centers and would inform each profit center general manager about his or her cash flow.

Olsen explained that he was trying to create an innovative business model to be able to enter into markets quickly.  In order to operate profit centers, he testified, it required robust bookkeeping and logistics systems.

HIPinc's first profit center was a real estate venture named Real Ventures.  Another profit center was Olsen's wife's business named Montana Made Batik.  Another profit center eventually owned three buildings.  Another did consulting work for defense contracts, and the consulting business, according to Olsen, generated a lot of profit.  Another profit center did consulting work locally in the Bitterroot Valley.

In addition to conducting business activities to generate profit, Olsen also wanted to perform community services in the Bitterroot Valley.  As part of that, HIPinc took over the local

4

Performing Art Series and produced it for a year.  Olsen's research indicated that the Performing

Art Series probably would not make any profit and, after a year, HIPinc formed a nonprofit to run

the Performing Art Series.

Olsen hired Herring to work at HIPinc as its business manager.  Herring described her job

duties as including writing checks to pay bills and entering data into HIPinc's QuickBooks

software program.  Herring testified that she was not the only person who had access to HIPinc's

QuickBooks.  Boland is a bookkeeper who began working for Meikle at Great Bear Restoration

as bookkeeper in October 2006.[2]  Herring testified that Boland had access to HIPinc's

QuickBooks.

Schmidt worked for HIPinc since 2004 when she began as a property manager.  Before

HIPinc she worked with Meikle at Bitterroot Restoration for several years.  She testified that she

attended a "business incubator" conference in Denver, where Olsen was approached to start a

business incubator.  She testified that Olsen invested $60,000 in start up money at HIPinc.  At

HIPinc Schmidt worked in property management for several projects, including an entity

providing housing for domestic violence victims.

**Origin of Great Bear Restoration.**

Olsen and Meikle were neighbors, and occasionally went on bike rides and socialized

together.  Meikle's employer Bitterroot Restoration was going out of business and closing.

Meikle wanted to own his own company.

Meikle and Olsen met and discussed Meikle's goal of owning his own business, and what

---

[2]Boland originally worked as a contractor for HIPinc and later Great Bear Restoration. She decided to become an employee of Great Bear to take advantage of generous employee benefits.

Olsen's company HIPinc could provide Meikle in the form of office space, support, bookkeeping and tax preparation services.[3]  Olsen sent Meikle an employment offer, Ex. 1 dated April 17, 2006, which Meikle turned down because, he testified, he wanted to own his own company.[4]

Olsen testified that in September of 2006 Meikle approached him and asked him to meet with Meikle and some other employees of Bitterroot Restoration, which was closing.  After meetings and negotiations, Meikle accepted a position offered at HIPinc.  Ex. 2 is a "Job Description" dated October 21, 2006, and signed by Meikle and Olsen, wherein Meikle accepted a position as "'Great Bear Restoration' Operations Manager/Senior Restoration Ecologist" who "shall report to the President of HIPinc."  Olsen signed Ex. 2 as HIPinc's president, not in his individual capacity.

Ex. 2 describes Meikle's annual base pay as $50,000 plus bonus and profit sharing.  Profit sharing is described on Ex. 2 as follows:

> **Bonus and Profit Sharing (See details below).**  Profit sharing includes "Net Remaining Profit" from the Profit and Loss Statement of the Great Bear Restoration Enterprise.  In addition, HIPinc provides profit sharing (with no match required) after one year of employment under most conditions.  *The percentage of pay* [is] *at the discretion of the President of HIPinc.*  The amount has been 5% to 25%.
>
> * * * *
>
> Bonus and Profit Sharing.  HIPinc will maintain books and records so as to provide Profit and Loss Statement for the Meikle Restoration Consulting Enterprise.  *HIPinc accounting practices will be used.*  The Profit and Loss Statement will include all sales and other income directly attributable to the

---

[3]Olsen testified that he never used the term "business incubator" when speaking with Meikle, although he had written about the concept.

[4]Ex. 1 included a provision that Meikle will own all intellectual property in return for 10% of all royalties he receives.  Olsen testified that no such provision was included in Ex. 2.

6

Enterprise.  Expenses shall include the direct fringe benefits of the Employee and any other employees hired specifically for the enterprise.  This "Enterprise Fringe" shall be subtracted from the HIPinc Overhead and Administration expense, which shall then be used to calculate the HIPinc Overhead Rate.  The HIPinc overhead rate includes the full depreciation for Capital purchases primarily for the Enterprise and rental expenses for any office which was built for the purpose of renting on the open market.  The HIPinc Profit shall be 6% of Sales or 25% of Profit, whichever is less.  Direct costs include expenses incurred by the enterprise (shared capital, book keeping, travel arrangements, and normal office supplies are included in the HIPinc overhead).

* * * *

It should be noted that the HIPinc Overhead can vary depending on the sales of services in other enterprise profit centers.  Currently the Remaining HIPinc Overhead would be about 10%.

* * * *

This constitutes the entire agreement and the parties are not relying on verbal discussion or commitments.

Ex. 2 (Emphasis added).

When asked on cross-examination what the "entire agreement" clause meant, Meikle testified that it meant that Olsen had formed an umbrella corporation based on a business incubator system.

Olsen testified that he set up the profit and loss ("P&L") system in Ex. 2 the same way he did for all HIPinc's profit centers, in order to segregate profits from expenses.  Olsen admitted that his practice was not to track direct costs to profit centers.  As to the "Bonus and Profit Sharing" section of Ex. 2, Olsen testified that the bonus plan evolved over time.

Olsen testified that he was Meikle's supervisor and that Meikle told him that he wanted to be an employee.  The "Term" section on page 1 of Ex. 2 explains that Meikle's position depended on funding from billing to consulting and other income.  After April 2007, Meikle's

position depended on the income generated.  Olsen testified that this section informed Meikle about the risk that his position might be terminated.

Ex. 2 includes an intellectual property provision which provides that the employee will retain rights to any inventions or copyrights which he develops on his own or while working for HIPinc.  Olsen testified that this provision covered all intellectual property, and that it allowed Meikle to obtain a patent on his products and could keep it.  Olsen testified that Meikle had a provisional patent for his Ecosod product, but that it had expired and was not pending.  Meikle disagreed.

Olsen testified that Meikle did not contribute money or tangible assets when he went to work for HIPinc and that Meikle's government grants were not transferred to HIPinc., while HIPinc contributed $25,000 in capital for the Great Bear Restoration venture.  Meikle did not want the risks or expenses of setting up his own business, since he had never done it before, and he testified that the cash flow (if needed), office space and overhead services provided by the HIPinc business incubator appealed to him.  Meikle testified that he brought his talents, contacts, ideas, products and his grants into the new Great Bear Restoration, but that he refused to invest his own money because he had just been laid off from Bitterroot Restoration.  Olsen admitted that Meikle brought his talent and "what was in his head" to Great Bear.

Olsen testified that Great Bear Restoration was supposed to pay its fair share of overhead and indirect costs.  Great Bear's employee wages were on a "pay as you go basis."

Meikle prepared a draft business plan for Great Bear Botanical Services, LLC.  Ex. 3. Olsen testified that he told Meikle to take the "LLC" letters off the business plan.  HIPinc registered the name Great Bear Restoration as a dba of HIPinc.  Ex. A.  Olsen denied ever telling

8

Meikle that he was on his own and denied giving Meikle Great Bear as a separate legal entity.
Olsen testified that he, Boland and Herring had signature authority to write checks for Great
Bear.  The parties operated under Ex. 2 for a few years, until a dispute over HIPinc's accounting,
overhead and bonus calculations arose in early 2010 and Olsen terminated Meikle and ordered
him off of HIPinc's premises.

The approved Final Pretrial Order sets forth the following agreed facts:

    1. Defendant Olsen has listed Plaintiff Meikle as an unsecured creditor
holding a contingent and unliquidated debt in his bankruptcy estate.

    2. HIPinc is a close corporation formed under the laws of the state of
Delaware on April 29, 1991, in which Defendant holds a 93% ownership interest.

    3. On or about October 21, 2006, Plaintiff and Defendant entered into a
written agreement with the title "Job Description" that specified that Plaintiff
would be the operations manager and provide services for a profit and loss center
for HIPinc called "Great Bear Restoration." The agreement projected that the
position could be supported by the company for 6 months, with continuation
depended income generated beyond that date.

    4. The agreement provided for profit sharing between Plaintiff and
HIPinc based on the amount of profits generated by the profit center. The profits
would be split 75% to Plaintiff and 25% to Defendant, with overhead and general
administrative expenses and fringe benefits and payroll taxes included as an
expense for the profit center in accordance with a written financial policy.

    5. Great Bear Restoration is a registered trade name of HIPinc. All income
tax reports and taxes were filed by HIPinc and paid by the owners of HIPinc.

    6. In promotional fliers produced by HIPinc, the Great Bear Restoration
profit center was described as a "business within a business."

    7. In the first six weeks of operation, Great Bear Restoration had over
$150,000 in sales.

    8. By May of 2007, roughly seven months after it started, Great Bear
Restoration had booked over $ 800,000 in sales, was profitable, and had a positive
cash flow.

9. On May 25, 2007, Great Bear Restoration was graduated "from a start-up enterprise to a profit making business."

10. By the end of 2007, Great Bear Restoration had over $1.5 million in sales.

11. On June 25, 2008, Debtor Olsen published a "post graduate charter" for Great Bear, discussing how the incubation process had concluded.

12. In July of 2008, Great Bear had reached "post-graduate" status in HIPinc's incubator model.

13. In 2009, Great Bear Restoration booked over $ 1.4 million dollars in income which constituted 67% of all HIPinc. income.

14. In 2010, Great Bear Restoration booked over $ 2.0 million dollars in income which constituted 98% of all HIPinc. income.

15. In 2010, Defendant insisted that Great Bear was running out of cash.

16. In September of 2010, Plaintiff was diagnosed with cancer.

17. Plaintiff left work in November of 2010, and returned in mid December 2010. In January of 2011 Defendant indicated to him that Great Bear had lost money in 2010.

18. On morning of January 17, 2010,[5] Plaintiff provided Defendant a letter terminating the relationship between Great Bear Restoration and HIPinc.

19. The Plaintiff and other and HIPinc agreed to a confidential mediation which was held on February 8, 2011. All of the parties present at the mediation signed the agreement, although one member of the Great Bear Group who resides in Bozeman did not sign it then or ever. The agreement included the turnover of the Great Bear Restoration capital and operations to a group called the Great Bear Group which was formed by the Plaintiff.

20. HIPinc received a letter a week later stating the group could not implement the agreement. In the next week both parties offered modifications to the agreement. The Plaintiff and the Great Bear Group broke off continued negotiations with a letter that included that they considered it the end of the

---

[5]The year 2010 clearly is a typo, both on Ex. 17 and in the agreed facts. The correct year of the letter on Ex. 17 is 2011.

matter.

21. The Plaintiff filed and received unemployment benefits.

22. The Plaintiff filed a wage claim with the Department of Labor in which he claimed he was owed wages after February 8, 2011, which was denied with prejudice.

Additional facts may be gleaned from the testimony and exhibits. Ex. 6 ("About HIPinc") describes HIPinc's organization, including a chart showing Great Bear Restoration as one of HIPinc's profit centers, along with Montana Made Batik and others. Ex. 6 includes a press release announcing the grand opening of Great Bear Restoration, conceived by Meikle and Olsen.

Ex. C includes a HIPinc organization chart dated January 4, 2008, post-graduation. It shows Olsen as HIPinc's president. Holly Milstead[6] and Boland are shown in business administration under Olsen, and he testified that those two were salaried employees of HIPinc. Meikle is shown as general manager of the Great Bear Restoration profit center under Olsen. Ex. 44 shows other entities within HIPinc including Trapper Creek Forge and Montana Made Batik Studio II, which Meikle testified was a small T-shirt operation which sold T-shirts at farmer's markets which Olsen wanted to grow.

Meikle admitted that Great Bear Restoration was a business within HIPinc's business, but he testified that Great Bear operated as a separate business. He admitted that Great Bear was a profit center of HIPinc, but he testified that Olsen promised him that Great Bear Restoration would be an LLC.

Meikle admitted that Great Bear Restoration received some money from HIPinc in the

---

[6]Identified as Holly Herring at trial.

winter of 2008 because Great Bear could not meet its payroll, but he testified that Great Bear paid HIPinc back.  It was understood that HIPinc would provide cash flow and overhead to Great Bear Restoration, if needed.  Meikle admitted that HIPinc borrowed money to pay for Great Bear's acquisition.

Meikle testified that he was an employee of HIPinc only for taxes, bookkeeping and insurance purposes.  He admitted that he received W-2 forms from HIPinc, but he testified that Olsen knew that Meikle wanted his own business.  Olsen testified that Meikle was a salaried employee.  Although he admitted that he refused to put up his own funds, Meikle testified that he had an investor relationship with HIPinc, in which HIPinc was entitled to 25% of profits.  Instead, Meikle testified, Olsen took advantage and seized all of Great Bear Restoration's profits and used it for to pay the expenses of HIPinc's other profit centers.

Olsen testified that a business incubator must organize its books and records so that income and expenses get allocated to the proper profit center.  The problem, as Olsen described it, is allocating general and administrative expense ("G&A") for indirect costs.  Olsen testified that he has done such allocation, and that indirect costs needed to be allocated to each entity as provided in HIPinc's rate sheets.

Meikle answered "absolutely not" when asked whether Olsen told him that Great Bear Restoration would subsidize other entities in the HIPinc incubator.  Meikle testified that Great Bear Restoration was a stand-alone company responsible for its own costs and payroll and, if his business shared a building with another business, the utility and cleaning expenses would be split between the entities.

Ex. 4 are Meikle's notes from a meeting with Olsen and others dated 11/6/06.  Ex. 4

12

shows that they discussed capital investment and profit sharing and overhead. Asked on cross-examination why he and Meikle discussed capital assets and parting ways, Meikle answered that he was an employee who did not want to start his own business, but that he aspired to own a business; they discussed capital assets and parting ways in order to transfer equity in Great Bear to Meikle and others.

Olsen testified that, at the time of the meeting on Ex. 4, he was not considering contracts with defense companies, but that when Meikle joined HIPinc he told Olsen that Great Bear Restoration had a "time and materials" contracts which required "DCAA" ("Defense Contract Audit Agency") compliance. Olsen explained that defense contractors strive to comply with DCAA requirements because they want defense business. Olsen decided to change how HIPinc made its fringe allocation in order to become DCAA compliant.[7] Olsen testified that he believed HIPinc was in compliance with GAAP.

On the second page of Ex. 4, Meikle noted that overhead would be 10.3 percent (10.3%) and could go to 15%. Under cross-examination Meikle testified that Great Bear Restoration's overhead generally was less than 10% and he did not believe it ever reached 15%. Meikle explained that he expected a high overhead percentage because he wanted to open a greenhouse business to serve a large void in the market of supplying native plants created after Bitterroot Restoration went out of business. Meikle testified that if a profit center paid in capital from its profits, then the capital belonged to the profit center, while if HIPinc contributed capital it

---

[7]Olsen testified that one cannot know whether an entity is DCAA compliant without an audit conducted by DCAA. He testified that he thought HIPinc was DCAA compliant in years 2007 and 2008, but he did not know. By the end of 2010, although he tried, HIPinc was not DCAA compliant regarding allocation of fringe.

belonged to HIPinc and that Ex. 4 provides that HIPinc is entitled to 25% of Great Bear's profits. Meikle testified that the rest of profits were to be shared by Great Bear's principals and staff.

Meikle admitted that HIPinc contributed capital to Great Bear Restoration, and gave Great Bear access to lines of credit which Great Bear was paying back. Olsen testified that Great Bear was charged for HIPinc's lines of credit because that was how they were tracking cash flow. Meikle did not pay money into Great Bear, but he testified that he contributed his talent, botanical equipment, library, contacts, knowledge, products and brought in $2 million worth of business.

Meikle testified that Great Bear Restoration needed capital equipment in 2006 and that Great Bear contributed profits to purchase the greenhouses. Olsen testified that the money to purchase the greenhouses came from HIPinc's profit centers, plus one loan to Olsen[8] from First Interstate Bank secured by a mortgage on Olsen's residence,[9] and another loan secured by the greenhouses. Olsen testified that the greenhouses represented capital rather than a direct cost. Accordingly, interest on the greenhouse loans were deducted from Great Bear's profit as G&A expense; the principal payments were represented on the spreadsheets as depreciation, not overhead.

Ex. 32 is a "Policy 200 – Accounting and Financial Management" outline for HIPinc dated October 27, 2006. Section 3.1 on page MMS 242 of Ex. 32 describes "Profit Center,"

---

[8]Olsen testified that he could borrow a personal loan at a lower interest rate. When he loaned money to HIPinc, he testified, he would sign on HIPinc's behalf a promissory note payable to himself. He testified that he had done it before, loaning a total of approximately $300,000 to HIPinc.

while a much briefer description of "Cost Center" is at Section 3.2 at MMS 243.  Olsen denied that he defined cost centers and profit centers depending on what he wanted.  At his deposition Olsen testified that he decided to define an entity as a cost center or profit center depending on whether he actually thought that the entity should make a profit.  Dep., p. 285.  Section 2 on MMS 242 lists costs centers and profit centers of HIPinc.  On cross-examination Olsen admitted that Emma's House listed at Section 2 as a profit center is incorrect, as Emma's House was a cost center.

Olsen testified that employee fringe was not listed in the list of overhead in Ex. 32.  Fringe benefits and employee taxes are listed in section 3.1 of a profit center's P&L, but Olsen testified that he never tracked the fringe benefits of a particular employee to a profit center.  Ex. 32 at page MMS 243 includes categories of accounting charges, including overhead,[10] administration, sales and fringe (and employee taxes).

Meikle testified that the G&A expenses listed in Ex. 32 were more limited in number than Olsen's later policy outlines.  The list of overhead in Ex. 32, page MMS 243, does not include Olsen's salary as president.  However, it does include "HIPinc Administration Salaries; Bookkeeping; Office Management, Human Resources, Policies and procedures."  Olsen testified that his salary as president was included in that list within the scope of "HIPinc Administration Salaries," and that latter policies simply gave more detail of some costs which were already included.

Under cross-examination, Meikle testified that he never saw a HIPinc binder labeled "Policies" where its policies could be found.  Olsen testified that he gave Meikle a draft copy of

---

[10]Boland testified that overhead rates shown in Ex. 32 were paid monthly.

the financial policy and that Meikle had access to the policies.  Herring testified that HIPinc's policies were kept on its computer servers and that both Meikle and Boland had the ability to access the policies remotely. Olsen testified that Meikle had a duty as Great Bear's operations manager to learn and know its financials and that if Meikle had questions he could have asked Olsen.

Ex. 5 is Meikle's draft business plan for Great Bear Restoration, dated 11/16/06 in which he identifies the type of projects he believed he could get on page 10.  Meikle prepared Ex. 5 as an internal plan and gave Olsen a copy.

Ex. 33 includes a "Policy 201" given by Olsen to Meikle on January 4, 2007, outlining Great Bear's capital and accounting policies approved by Olsen as president.  The first few pages of Ex. L appear to be the same as on Ex. 33.  Meikle testified that the policy changes regarding capital policy in Ex. L were different than his original agreement with Olsen and that he did not agree with the new capital policy.  Meikle testified that Olsen's statements in the HIPinc 2006 and 2007 policies for what would be charged for bookkeeping and payroll are the representations which Meikle alleges were false and fraudulent.

Ex. J is an email from Olsen to Meikle dated March 27, 2007, about how to allocate the cost to pay Great Bear's bookkeeper Boland, other overhead and capital costs and the need to be DCAA compliant in HIPinc's cost accounting and labor reporting.  Meikle testified that he was told that HIPinc had to comply with DCAA standards in order to qualify to compete for defense contracts.  Olsen testified that he hired an expert from Colorado Springs to help HIPinc become DCAA compliant.  To achieve DCAA compliance, Olsen testified, HIPinc had to split G&A costs from fringe, which it previously combined, and also had to calculate G&A and fringe rates

16

from costs rather than by revenue. Olsen testified that he believes HIPinc was in compliance with GAAP and probably would have been in compliance with DCAA except for one employee (his wife) not filling out time cards.[11]

Meikle answered "absolutely not" when asked if Ex. J gave him notice that Olsen was going to add charges to the G&A pool. Ex. J states that for DCAA compliance, "the HIPinc G&A (which is called overhead) gets applied to all costs." Ex. J further states that "all bookkeeping, except inventory control, would be on HIPinc G&A." Meikle admitted that he could have asked about the changes in policies, but he did not because their original understanding was that HIPinc would do the bookkeeping, taxes and payroll, and he was fine with that. Meikle testified that he did not ever directly supervise HIPinc's bookkeeper Herring, and that Boland became his administrative assistant; he relied on Boland and Herring for Great Bear's bookkeeping.

Olsen testified that for the year 2007 Great Bear Restoration was profitable mid-year, but at the end of the year Great Bear had not made a profit. Nevertheless, he testified that HIPinc paid Meikle a $10,000 bonus from profits made by a different consulting profit center of HIPinc. Olsen testified that the usual time for a profit center to be in the business incubator was 6 months, at which time they would take a "hard look" at whether to continue.

By May 15, 2007, HIPinc celebrated Great Bear's graduation from a start-up enterprise to a profit making business. Ex. 7 states that Great Bear was profitable, that it had a positive cash flow and that HIPinc "celebrated Great Bear's graduation from a start-up enterprise to a profit

---

[11]Olsen explained that his wife submits time cards for work she performs for other HIPinc entities, but not for Montana Made Batik because she is the only person who works there.

making business . . . ."  Ex. 7 states that HIPinc's sales for 2007, including Great Bear, exceeded $5.5 million.  Olsen explained that the number was true based on contracts on hand, but that some were multi-year contracts.  Olsen authorized for Great Bear to graduate from the incubator. Meikle exercised that authority and they held a graduation ceremony.

Olsen testified that he spoke with Meikle about his expectations post-graduation and showed Meikle a draft of the post-graduation charter.  Olsen testified that the charter was a way to celebrate and put formal constraints on a profit center with respect to its expectations.  Ex. 11 is Issue No. 1 of the Post Graduate Charter for Great Bear Restoration and includes a description of Meikle's authority as Great Bear's general manager to make contracts, purchase materials, hire and fire and submit proposals for values up to $500,000.  With respect to hiring and firing employees, Olsen testified that Meikle was given authority to hire seasonal employees post-graduation, but he was not authorized to hire permanent employees without consulting Olsen, based upon Olsen's business practices.  Ex. 11 authorized an enterprise post-graduation to pen its own checking account and "[a]n investment repayment plan is established" (page HIP-282).

Meikle testified that Great Bear Restoration repaid HIPinc for its initial $25,000 investment and that Great Bear opened up its own checking account and set up separate accounting, although it continued to use HIPinc to perform payroll services.  Meikle testified that Great Bear's post-graduation charter authorized Great Bear to establish a checking account and write checks to pay for greenhouses and business expenses.  Olsen testified that HIPinc's business model included separate checking accounts for graduated profit centers in order to show its customers that Great Bear had its own identity and bank account and also to give the manager Meikle a sense of obligation to manage the entity's cash flow.

18

Meikle testified that, after graduation, Great Bear Restoration could have split off separately from HIPinc, although HIPinc would still be entitled to 25% of Great Bear's profit. Meikle testified that he chose to stay within HIPinc after graduation to take advantage of its support and payroll services, because Great Bear was taking on large contracts and large projects. Olsen testified that a graduation and charter did not separate a profit center from HIPinc and did not create new ownership.

Ex. 46 is minutes from an advisory board meeting dated October 5, 2007. At the bottom of Ex. 46 is a review of Great Bear's financial structure and a provision that Great Bear's start-up costs will be included in HIPinc's overhead at first with a later determination whether that structure is beneficial. Olsen testified that he never actually did what was proposed in Ex. 46 and that start up costs ended up coming out of HIPinc's profit rather than overhead.

For the year 2007, Olsen testified at trial that Great Bear lost money. In Ex. 10, the page HIP-309, Olsen reported that Great Bear made over 6% profit for 2007. Olsen admitted that his testimony is the opposite.

As of 2008, Meikle testified that Great Bear's 75% share of its profit was not distributed to its principals and staff as he felt it should have been. Olsen testified, notwithstanding the bonus provision at Ex. 2, p. 2190, that was not the actual bonus plan and that HIPinc had a written profit sharing policy company-wide, including Great Bear, which evolved over time, and that HIPinc paid Meikle a small $500 bonus for the year 2008. Olsen testified that HIPinc made a profit as a whole, which was put back into Great Bear to pay for the greenhouses. As of January 2009, Meikle testified, he felt that the G&A expenses charged by HIPinc were way out of line.

19

In January of 2010, Meikle again requested information from Olsen about HIPinc's accounting.  Meikle testified that he was concerned that Olson was using all of Great Bear Restoration's profits each quarter to pay fringe benefits of and invest in other HIPinc profit centers instead of retaining the profits in Great Bear for calculation of bonuses and profit sharing. Meikle testified that he met with Olsen, but that Olson ignored his questions and instead showed some slides.

Ex. 29 is a summary of HIPinc's G&A rates for 2009 and projections for 2010.  Ex. 29 states that G&A rates for 2010 will be managed to stay under 9% "in the extreme" and to stay at the current rate of 7.5% or below.  If Great Bear achieved $2 million in sales and other enterprises make at least $500,00 in sales, Ex. 29 states that the G&A rate "should be between 5% and 6%."  The second page of Ex. 29 states that HIPinc, Great Bear and Consulting made a profit in 2009, but four other entities lost money.

Ex. 16 is Great Bear Restoration's 2009 Profit Sharing Plan.  Meikle testified that HIPinc had the right to 25% of Great Bear's profit and Great Bear had the right to 75% of profit.  Olsen testified that he spoke with Meikle about profit sharing in 2009 and that HIPinc followed its policy, but that Great Bear was not profitable in 2009.

Ex. 34 is a "Policy 200" description of HIPinc's accounting and financial management, last revised February 11, 2010.  Ex. 34 includes HIPinc as the "entire Corporation," and Great Bear Restoration as one of the profit centers.  Ex. 34 omitted the description of cost center at Section 3.2 of Ex. 32.  Olsen explained the omission because the earlier document was not consistent.

Page 2340 of Ex. 34 includes Section 5 ("Allocation of Capital Assets on Balance

Sheets"). Section 5 provides in part that if, "by mutual agreement, designated principles [sic] from these Profit Centers leave HIPinc and set up a separate business, ownership of these capital assets may be transferred to the new entity under the terms of the agreement with the Principles." Olsen explained that this language was a change in policy and reflects a 2007 document he had given Meikle explaining how principals become owners. Notwithstanding Section 5, Olsen testified that he did not consider Meikle to be an owner of Great Bear Restoration at the time of Ex. 34.

Meikle agreed that the profit center structure outlined in Ex. 34 is consistent with his understanding and original agreement with Olsen. But, Meikle testified that if he left HIPinc after paying for Great Bear Restoration's greenhouses, the greenhouses would be Great Bear's. Page 2342 of Ex. 34 includes a much longer list of possible G&A expenses than Ex. 32. However, both Ex. 32 and Ex. 34 include a catch-all item: "Other expenses not booked to a specific Profit Center of Cost Center." Meikle testified that Olsen added many more items to the G&A expense list on Ex. 34 than were included in their original agreement and that Olsen had turned the G&A into an investment fund, to which Meikle had never agreed.

Great Bear grew and built greenhouses to expand. Meikle authorized Herring of HIPinc to write checks for Great Bear's purchases. Olsen agreed that HIPinc's employees wrote checks on Great Bear's account to make payments on the three greenhouse loans. Ex. 18 includes checks on Great Bear's account written from 12/30/08 through 12/17/10. The checks are signed by Holly Milstead, and some by Boland. Herring testified that she did not check with Olsen before signing each check. The checks written to pay for the greenhouses were signed by HIPinc employee Holly Milstead, although Meikle testified that the money used to pay for the

greenhouses came exclusively from Great Bear Restoration profits. Asked about the greenhouse loan payments on cross-examination, Olsen testified that HIPinc transferred money in and out of its various accounts to manage cash and pay bills. Olsen sent quarterly financial reports to the managers of each of HIPinc's profit centers.

Meikle did all the work regarding Great Bear's purchase of greenhouses, although he did consult Olsen about a land lease. Meikle testified that Olsen referred to Meikle in presentations to prospective clients as a small business owner and principal of Great Bear Restoration. Meikle testified that Olsen had no involvement with Great Bear's technical matters or management, except that Olsen helped Meikle in hiring one employee identified as Matt.[12]

Meikle testified that HIPinc's bookkeeping records and policies were on servers to which he did not have access, but he later admitted that he had access to HIPinc's QuickBooks. Meikle testified that he got 99% of his information from Herring.

Meikle requested information about HIPinc's assessments of G&A expenses in 2009 and 2010. He testified that he believed that Great Bear Restoration would have made a profit in 2010 except for the amounts of overhead and fringe expenses which HIPinc charged against Great Bear. Meikle explained that his salaries were based on bonuses calculated from profit and that Olsen's charges for G&A and fringe were far in excess of what was allowed under their original agreement.

Meikle admitted that Olsen offered to make HIPinc's QuickBooks data available, but he testified that he did not trust those numbers because he thinks that HIPinc's QuickBooks data had

_____

[12]Meikle explained that Olsen explained to prospective employees that a relatively low starting salary would be made up for by profit sharing at the end of the year.

been changed.  During discovery Meikle's attorney served Olsen with several interrogatories No. 21, 22, 26, 27, and 37, asking Olsen about the total amounts allocated to cost center and/or cost centers Montana Made Batik, Consulting Services, and Emma's House, for salaried fringe/fringe benefits in 2009 and 2010.  Olsen gave similar written non-answers to each of those interrogatories and at trial he admitted that he did not give an answer.[13]  He explained that he did not have the history so could not provide the answer.[14]

Olsen conducted a seminar in December of 2010 in an attempt to address Meikle's complaints about HIPinc's G&A expense/fringe benefit and profit sharing calculations.  Olsen prepared charts showing the percentages and actual fringe and G&A.  Ex. 49 is Olsen's memo and chart for the seminar, dated December 14, 2010.  Meikle testified that Olsen's seminar was done simply to humiliate him because it included information about child care and other fringe benefits, and did not answer Meikle's questions.  Olsen denied having any intent to shame anyone.  Meikle testified that he did not become aware until this seminar that Olsen had made the changes from the 2006 and 2007 policies to add more charges to Great Bear's G&A and fringe.  Boland testified that no one was aware of the policy changes made by Olsen to add charges to Great Bear's G&A and fringe and that Olsen did not explain.

Meikle testified that Olsen was charging anything he wanted against Great Bear's G&A, that HIPinc's charges to G&A were excessive and that the way Olsen described the G&A calculations was drastically different from what Meikle had agreed to, with the result that Great

---

[13]Olsen's answer to Interrogatory No. 27 for Emma's House fringe in 2009 was $0.00.

[14]Olsen's discovery answers for Nos. 21, 22, 26, and 37 state that the allocation is done on a spreadsheet that is overwritten every quarter, and that HIPinc did not preserve computer backup until beginning May 2011.

23

Bear Restoration could never be profitable and pay bonuses because Olsen was taking all of Great Bear's profits.[15]  Meikle wanted an accounting.

Olsen had ideas to invest in the Montana Batik (Studio II), and the Bitterroot Performing Arts Series.  Schmidt was a member of the investment committee for HIPinc.  She testified that she learned at meetings that HIPinc's other profit centers were not bringing in profit and that Olsen solicited discussion at the meetings about whether additional investments in businesses was a good idea.  She testified that Olsen said he planned on a big loss from the performing arts series and she thought both ideas would lose money.  She testified that Olsen went ahead with the boutique investment and that he discontinued the investment committee meetings because he did not like being disagreed with.  Boland testified that Olsen solicited input from the committee about his ideas, but that Olsen insisted in pursuing his new projects even when other committee members told him that his proposed projects were not viable.  Olsen denied that he stopped holding investment committee meetings because he was being criticized.

Olsen admitted that he put more money and staff into Studio II in 2010, from profit and owner loans, but it continued to lose money and he shut it down.[16]  Schmidt testified that she started working for Great Bear Restoration in 2010 performing technical services for its landscaping business because no money remained to support her position as property manager for HIPinc.

_____

[15]Meikle agreed that Olsen could do whatever he wanted with HIPinc's 25% share of Great Bear's profits.

[16]Olsen explained that Studio 2 also lost money in 2009 and that its mistake was in carrying too large an inventory.  When it lost money again in 2010 he shut it down.  Ex. 49 shows a profit for Studio II of "($53,667), which Olsen testified was a negative number.

Meikle testified that his concern was in 2009 and 2010 Great Bear was being charged $168,000 for G&A, which Great Bear did not incur because under their original agreement Great Bear was only supposed to be charged for overhead and office space.  When asked on recross-examination about his understanding of indirect costs, Meikle testified that indirect costs are those not attributable to sales.

Meikle testified that he could not get information from HIPinc about what fringes for other profit centers Great Bear was being forced to pay for and that the bookkeeper Boland did not have access to the fringe data.  Olsen testified that he explained to Meikle about G&A Pools, and that Great Bear Restoration could expect to pay a percentage of sales and costs in a greater rate if HIPinc's other profit centers fail.

Meikle testified that he felt Olsen was treating Great Bear Restoration as a cash cow, to purchase things and charge them against Great Bear so there would be no profit from which to pay bonuses to Great Bear.  Meikle testified that he never would have entered into the agreement with HIPinc, Ex. 2, if he had known that Olsen was going to use Great Bear Restoration's profits to fund other HIPinc profit centers.  Meikle accuses Olsen of bankrupting his company Great Bear Restoration.

Olsen testified that the chartered account is the document which controls whether to book a charge to a specific profit center.  He testified that he talked to Herring and Boland about where particular charges would go in order to follow the rules, but that as president he had the ultimate authority.

Olsen testified that all of Great Bear Restoration's financial information was available to Meikle and that he had no intent to deceive Meikle or to hide profit sharing and G&A costs from

him.  Olsen testified that as of December 2010 HIPinc was in a tense position because several profit centers stopped making profits.  He testified that he learned that Great Bear was underbidding its contracts and not making enough revenue to cover its overhead and G&A.  Olsen testified that he intended for Great Bear Restoration to succeed and he depleted his own retirement account almost entirely keeping the business afloat.  Eventually, he testified, HIPinc got through the crisis.

Ex. 43 is an email from Olsen to Meikle and others dated January 7, 2011, in anticipation of a presentation by Olsen.  Page 2109 of Ex. 43 states that HIPinc's financial process meets several standards, including GAAP, IRS, and DCAA.  Olsen acknowledged that Meikle's expert Rowsey testified that HIPinc did not comply with GAAP, but he insisted that his intent was to meet GAAP standards.

Meikle testified that the handling of HIPinc's finances and books described in Ex. 43 was far different that their original agreement and job description (Ex. 2).  Meikle testified that originally HIPinc's G&A charges were limited in Ex. 32 to office rent, utilities and sick leave, but the new items added in Ex. 43 allowed Olsen to add anything to G&A, including a "catch all" entry for "other business expense."  Boland testified that she felt the G&A charges against Great Bear at page 2129 of Ex. 43 were much higher than before.

Olsen admitted that Ex. 43 does not include language including his president's salary in Great Bear's overhead, but he testified that the concept for inclusion was present by including HIPinc's expenses of administration.  Page 2129 of Ex. 43 includes a line entry under General and Administrative Pool "President's Salary for Managing the Company.  Does not include billed time."  Olsen testified that he did not think to include his salary as overhead when he prepared

Ex. 43, but put it in later. He did not agree that adding his salary into overhead would affect Great Bear's profit sharing. G&A also includes bookkeeping, taxes and interest not allocable to debt specifically allocated to a profit center. Ex. 43, p. 2129. Olsen testified that he first directed his changes in overhead to Meikle's attention in 2007 by email and that Tim could have asked him about the changes at that time. Asked whether he made those changes unilaterally, Olsen testified that he consulted with people about making big changes and then exercised his authority as HIPinc's president to implement the changes.

Ex. 30 is a revised rate letter Olsen sent by email to Meikle and others dated January 11, 2011. It shows amounts and final rates for G&A and fringe for 2010 as well as prior years. On rebuttal Meikle testified that he asked Olsen to explain how he was calculating G&A and fringe rates in 2009 and 2010, but that Olsen declined to give him an explanation. Ex. 30 shows the G&A rate during 2010 and 2011 was 8.8% of total costs, but only for Great Bear ("GB") and not for any of HIPinc's other profit centers. Olsen testified that he prepared the rate letter Ex. 30 only for Great Bear Restoration and not for any of HIPinc's other profit centers, in order to address Meikle's concern about his bonus, and that Meikle never alleged that HIPinc's other profit centers were not paying their fair share of G&E.

According to Olsen, Meikle expected a large bonus check for 2010 because he thought Great Bear had made a $20,000 profit. Ex. 30 states on page 2 that Great Bear operated at a loss of $42,727 and that HIPinc had a loss of $231,199 which it survived only because $160,000 in cash profits arrived at Consulting Services. The Salaried Fringe rate for 2010 was 80%. Olsen testified that Meikle was concerned about excessive G&A amounts, but that Meikle was using amounts not rates. Olsen prepared Ex. 30 to show Meikle Great Bear's finances.

27

Ex. 17 is a letter Meikle hand-delivered to Olsen dated 1/17/10,[17] in which Meikle attempts to "terminate" HIPinc's position as Great Bear Restoration's business partner. Ex. 17 states in part: "You have demonstrated a continued pattern of poor business judgment, lack of adherence to general accepted accounting principles, and questionable ethics in regards to your relationship with Great Bear Restoration." Ex. 17 goes on to state that "the stressful and inappropriate environment is inhibiting my return to health." Ex. 17 states that Meikle will be seeking binding arbitration for profit sharing review of G&A expenses/fringe benefits for the years 2007 through 2010. Although Ex. 17 and Ex. 2 each provides for arbitration, Olsen testified that the parties agreed to a mediation.

In response to Ex. 17, Meikle testified that Olsen asked for his keys and told him to pack up and leave. Meikle testified that he left when Olsen denied him an accounting of the G&A costs; it was clear to him that Olsen was including costs from other profit centers in Great Bear's overhead.

Boland testified that Olsen went to the greenhouse, where Meikle had gone to try to continue working and that Olsen was intimidating Great Bear's workers. Boland testified that Olsen had "trust issues" which were not justified and that she told Olsen he had to back off a little bit and let the workers decide what to do. Olsen agreed that he learned about a meeting of Great Bear Restoration's workers at the greenhouse and that he went there and described the staff as upset.

---

[17]The date of 1/17/2010 for Ex. 17 appears to be an error, although it is repeated in agreed fact no. 18 quoted above. If Olsen terminated Meikle and ordered him to vacate the premises in early 2010, Meikle could not have taken sick leave in November 2010 and returned in December 2010 as stated in agreed fact 17. The Court believes that Ex. 17 should be dated 1/17/2011.

Boland sent Olsen an email dated January 17, 2011.  Ex. 45.  She testified that, after Meikle "resigned," Olsen shut down Great Bear's computer servers and Boland was not able to perform her duties for Great Bear.  Olsen testified that Boland was trying to work from home and that if she had come to the office she had access to the server.  Herring testified that she saw Meikle and Boland looking at HIPinc's QuickBooks in January of 2011.

Boland called Meikle to ask what happened and he told her that he had seen it coming. Boland testified that she quit working for Great Bear after Olsen shut her out of Great Bear's computer servers several more times.  However, on redirect examination Boland testified that she was told by Herring that she was no longer employed at Great Bear.  On cross-examination Boland testified that she was under the HIPinc employment umbrella until she resigned, but later answered "No" when asked if she was an employee of HIPinc during all this time.  After resigning[18] Boland requested unemployment benefits based on her employment with HIPinc.

Schmidt sent Olsen a letter, Ex. 39, on January 24, 2011, in which she expressed her concern that HIPinc's spending on G&A costs and fringe should be decreased so that Great Bear Restoration could retain profits for growth and profit sharing.[19]  She testified that she was referring to the overhead HIPinc was charging Great Bear, which was robbing its profit, and that she wrote Ex. 39 because she was concerned about the toxic environment and "extremely poor management."  She described Olsen as rude, defiant, intimidating, and disrespectful to employees in public.  She testified that Olsen could be collaborative at times, but other times he would

---

[18]Boland did not know when her resignation became effective.

[19]Although Schmidt was an employee of Great Bear, she was not a principal so was not eligible for profit-sharing.

"bring the hammer down" and make decisions without input.  She testified that when Great

Bear's principals asked about overhead Olsen replied:  "I'm the boss."

Schmidt decided to resign when she realized that Olsen was not going to work together.

Schmidt sent Olsen her letter of resignation from HIPinc, dated February 22, 2011.  Ex. 38.  She

testified that she resigned because Meikle had resigned and the environment created by Olsen

was disrespectful, rude and intimidating to the long-term employees.  Olsen did not reply to

Schmidt's resignation letter.

Meikle formed an LLC for the purpose of taking over Great Bear Restoration.  Ex. J

shows a business entity named Great Bear Group LLC organized February 1, 2011, but was

voluntarily dissolved March 17, 2011.  Meikle testified that Olsen requested a recap from Meikle

around the end of 2010 or beginning of 2011, but that Olsen scheduled the recap to occur on the

date of Meikle's demand for arbitration in an attempt to avoid meeting with Meikle.  When the

parties went to mediation Meikle wanted to recover the profits he believed Olsen had taken for

HIPinc's G&A and fringe, and buy out Olsen for his 25% share of profits.  The negotiations

broke down over the issue of price.

Meikle testified that, while he was out on sick leave, he was told about certain errors in

Great Bear Restoration's accounting, but those errors were fixed in 2011 after he left.  Olsen

described one error involving double deposit problem to Western Energy and double billing in

March 2011.

Olsen testified that after Meikle left, HIPinc continued to use the EcoSod trademark name

and eventually sold it.  Olsen admitted that Meikle invented EcoSod but it was in the public

domain and that Meikle had no rights to it under license, while other entities were using Vam-

Grow, so Olsen felt that HIPinc could use those products.  On rebuttal Meikle vehemently

disagreed.  He testified that he wrote the research proposal/project summary[20] for EcoSod and

Vam-Grow while he was employed at Bitterroot Restoration, those products were judged to be

patentable and they absolutely were not in the public domain.  He testified that Bitterroot

Restoration had license to use his products and that they were part of the intellectual property he

brought to Great Bear Restoration.

**Other Accounting Evidence.**

Plaintiff offered extensive evidence of HIPinc's accounting.  Meikle's counsel cross-

examined Olsen about the sample formula for net remaining profit on Ex. 2.  Olsen testified that

HIPinc was allocating fringe benefits to its particular profit centers, first by revenues and later by

what was spent.

Boland's calculations included a review of HIPinc's postage and delivery in 2009 (Ex.

23, MMS 111) and telephone charges allocated to Great Bear's overhead from HIPinc's Account

QuickReports, Ex. 23 (MMS112).  Boland testified that the QuickReport documents were

generated monthly by HIPinc, but she was not aware of the changes in policy in 2009 and 2010,

even though she had access to the information, because it was not her job to look at them and she

was doing other tasks.

Boland wrote "Questionable" on page MMS 106 about item 6513 ("Supervision Labor").

She testified that Olsen was paying himself for managing himself.

Ex. 35 are overviews of HIPinc's profit/cost centers for FY years 2009 and 2010.  Ex. 35

shows that of HIPinc's profit/cost centers, only Great Bear Restoration paid G&A and Fringe for

---

[20]Ex. 51 was not admitted into evidence.

31

2009 and 2010.  Olsen testified that "Emma's House" shown on Ex. 35 was not a profit center,

but the other entities were.  Olsen testified that some of the zeros on Ex. 35 are not accurate, but

that it all was HIPinc's money.  Ex. 35 states that Montana Made Batik had $0.00 net income for

FY 2009.  In his deposition Olsen stated that Montana Made Batik never made money, but he

testified at trial that was a misstatement.  Dep., p. 243.  The Consulting entity on Ex. 35 lists

$0.00 G&A and Fringe paid to HIPinc.

Meikle testified that Olsen failed to provide him with information regarding HIPinc's

other profit/cost centers.  Olsen testified that Meikle had documents titled P&L statements, but

none of them were complete.  Olsen did not offer any complete P&L statements and he testified

that no exhibit shows what G&A and Fringe were allocated to Consulting.

Ex. 37 is Meikle's evidence of his damages caused by HIPinc's overcharging Great Bear

Restoration for G&A and Fringe for the years 2009 and 2010, plus interest charged on the

overcharges at the rate of 10 percent (10%) per annum, with a resulting total damages stated in

the amount of $389,169.29.  Ex. 37 states that Great Bear Restoration should not pay more than

5% for G&A rate.  Under cross-examination, Meikle testified that Great Bear's overhead rate in

2010 was 9.1%.

Boland described Ex. 25 is a spreadsheet showing Great Bear's 2010 fringe and G&A.  It

shows total G&A paid by Great Bear for 2010 in the amount of $158,190.64.  Ex. 25 includes

Boland's own handwritten calculation that Great Bear overpaid 2010 G&A by the sum of

$105,257.

Ex. 26 is a similar but not identical spreadsheet showing Great Bear's fringe and G&A

for 2010, without Boland's handwritten notes.  Herring testified that she created Ex. 26 to apply

the G&A and fringe rates which Olsen had published.[21]  She did not know how Olsen calculated his rates and she did not generate a spreadsheet for HIPinc's profit centers for 2010 because, she testified, no money was transferred into them.  Olsen testified that he not use the process shown on Ex. 26 at all.

Ex. 26 has a column "Total G&A" for Great Bear showing the monthly total G&A increasing from $1,833.85 in January 2010 to $43,650.78 in July.  Olsen admitted that Meikle and Boland expressed concern to him about the large amount of G&A, but not in reference to Ex. 26.  Olsen testified that he explained the increase in G&A to Meikle and Boland and gave them access to HIPinc's rate sheets.

Ex. 20, dated February 4, 2011, is an email from Boland to Meikle with more of Boland's calculations of the amounts Great Bear overpaid for G&A expenses for 2009 and 2010.  She testified that she prepared Ex. 20 to assist Meikle in his mediation with Olsen.  Boland testified that she thought the amounts HIPinc were charging Great Bear were too high across the board, and inflated.  At the time she prepared Ex. 20, Boland was shut out of HIPinc's servers and she admitted that she was in an adversarial posture against Olsen.

On cross-examination, Boland testified that she has "no idea" how Olsen calculated Great Bear's G&A.  She could not explain why Olsen included the additional items in Great Bear's G&A, and she concluded that it was Olsen's mistake to include them.  Specifically, Boland testified that she did not say that Olsen was deceptive about the additional items included in G&A.

---

[21]Herring began making spreadsheets when Great Bear Restoration started, she estimated sometime in 2007, in order to pay its G&A and fringe.  She testified that the spreadsheets were handwritten at first.  She retained the handwritten sheets for HIPinc's records.

Meikle's attorney cross-examined Olsen about several entries under G&A in Ex. 43, p. 2129, versus the items listed at Ex. 32, page MMS 243. Several items listed in the former were not listed in Ex. 32, including president's salary, computer equipment, office supplies, shared advertising and promotion and research and development cost ("R&D") for R&D not assigned to a profit center. Investment funds are listed at Ex. 43, 2129, but not at Ex. 32 MMS 243. Olsen testified that was an explicit change, but other changes simply gave more detail of what HIPinc already was including.

### Charity Rowsey Expert Testimony.

Rowsey is a forensic accountant hired by Meikle to give an expert opinion in HIPinc's accounting policies. She testified that she found most of the information used to form her opinion on her own. Rowsey answered "yes" when asked on cross-examination whether she was offered the opportunity to go to HIPinc and access its QuickBooks data, but she did not go. Referring to Ex. 11, Great Bear Restoration's charter, Rowsey testified that in her opinion it indicates that Meikle was an investor in Great Bear rather than an employee. While she did see some evidence of an employer/employee relationship between HIPinc and Meikle, Rowsey testified that the fact that some of Meikle's paychecks were withheld on occasion because of insufficient cash indicates that Meikle was an investor rather than an employee, because a company cannot withhold paychecks from an employee and an investor is subject to risk of loss to which an employee is not. On cross-examination Rowsey testified that, at the beginning based on Ex. 2, Meikle's relationship with HIPinc looked like an employment relationship, but that later he looked like an investor.

Referring to Ex. 33, Policy 201 for Great Bear's capital and accounting dated January 4,

2007, Rowsey testified that the reference to capital therein indicates that Meikle was an investor not an employee and the reference to capital would not be common in an employee relationship. Asked on cross-examination whether HIPinc's changes in G&A changes were made available to Meikle, Rowsey answered that Meikle was not aware of the changes, but she did not know of any attempt by HIPinc to hide the changes.

With respect to the second page of the original job description, Ex. 2, Rowsey testified that the formula for bonus and profit sharing "perhaps" complied with GAAP, but that HIPinc's application of the formula with respect to Meikle was not within GAAP standards. Rowsey testified that she examined whether HIPinc's policies affected Great Bear Restoration's profit sharing. In particular, Rowsey testified that the policy changes of Ex. 33 added to HIPinc's G&A a whole list of additional expenses which typically are not in that category. Referring to p. 2342 of Ex. 34, Rowsey testified that the G&A expenses listed there are not expenses which belong under G&A.

Asked her opinion on whether Olsen's use of G&A expenses complied with GAAP, Rowsey testified that they did not. Similarly, Rowsey gave an opinion that Olsen was not in compliance with DCAA standards in his allocation of costs. She explained that costs which can be directly measured and attributed to a particular activity should not be included in G&A expenses.

Asked about HIPinc's fringe calculations, Rowsey testified that its fringe appears to be extremely high. The national average for fringe is 30%, she testified, while HIPinc's fringe rate began at 30% but jumped to 80% without an increase in costs or benefits. She testified that Great Bear Restoration was charged for its own employees' fringe benefits plus the fringe

benefits of other entities.  Rowsey concluded that HIPinc's fringe rate did not appear reasonable.

Turning to Ex. 40, which Rowsey identified as Meikle's calculation of damages from lost wages, earnings and fringe benefits calculated from sales, Rowsey testified that she used sales because HIPinc's net income numbers were inconsistent, unreliable and included the inflated G&A expenses.  Rowsey used 18% for the high-end calculation of lost profit, she testified, based on the division of sales or profit from the original employment agreement, Ex. 2.  Ex. 40 reflects a low-end loss of earnings and fringe benefits for Meikle for the period from 2009 through 2012 in the amount of $657,479 and a high-end loss in the amount of $1,077,888.[22]

**Thomas E. Copley Expert Testimony**.

Copley is a certified public accountant ("CPA") with 35 years of accounting experience, who was hired by Olsen as an expert.  Ex. M[23] is Copley's expert report which he prepared after analyzing more than 800 pages of HIPinc's financial statements, which were provided to him by Olsen.  He also reviewed HIPinc's accounting policies.  He testified that HIPinc's accounting policies were complicated, but "generally" were in compliance with GAAP.  However, Copley testified that if a policy happens to not be in compliance with GAAP, that does not mean that a policy is wrong and that failure to meet GAAP standards does not imply fraudulent intent.  He testified that most small businesses do not comply with GAAP, but they use the parts that make sense to their business.

---

[22]The agreed Final Pretrial Order (Doc 54) at page 13, approved by counsel for both sides, limits Plaintiff's relief sought to G&A expenses and fringe benefits for 2009 and 2010, or lost profits for 2009 and 2010, plus interest.  The agreed relief sought does not extend beyond 2010 except for interest.

[23]Meikle's attorney withdrew his objection to Copley's preliminary report, but continued to object to Copley's supplemental report.  The Court admitted Ex. M.

36

Copley characterized HIPinc as a small business.  He testified that the reports on HIPinc's profit centers came out quarterly and he felt they gave a good recap on the company's financials. Copley reviewed Rowsey's expert report prior to undergoing his deposition by Plaintiff's attorney.  He testified that Rowsey's report did not change his opinion.

Relevant portions of Ex. M provide the following statements of Copley:

Based on my examination of HIP, Inc.'s accounting manuals and financial statements, the overhead and fringe benefit allocation calculation as it related to Great Bear Restoration's (GBR) financial statements was accurately prepared for 2009 and 2010.  Based on my review of relevant information the allocation appears reasonable and in accordance with HIP, Inc.'s accounting policies.  Great Bear Restoration produced income in 2009 and incurred a loss in 2010.

The inability of Great Bear Restoration to sustain 2009's profitability into 2010 indicates there was little equity value in GBR at December 31, 2010.

* * * *

Schedule 2 discussed above demonstrates that Great Bear Restoration did not generate enough income to cover its fringe benefit and general and administrative expense allocations in 2010.  The fringe benefit and the general and administrative expense allocations represent ordinary and necessary business expenses incurred by HIP, Inc., which were needed to provide essential services to its profit centers (including Great Bear Restoration).  *As such, they were properly allocated to Great Bear Restoration profit center.*

Ex. M, 3rd and 4th pages (emphasis added).

Copley testified that the concept of profit centers is not unusual in business and that it is common for expenses to be allocated to profit centers.  G&A is a term used for such indirect costs.  Copley testified that he does not think there is any GAAP principle which dictates how G&A are to be allocated between profit centers.  Further, he testified that he does not believe that GAAP dictates what types of costs can and cannot be assigned to G&A.  If an expense can be directly attributed to a particular profit center, Copley explained, then it is a direct cost.

37

Copley discussed with Olsen HIPinc's methods of calculating rates for G&A and fringe. Copley testified that he could understand Olsen's methodology for calculating rates.[24]  Copley formed his opinions in Ex. M based on his calculation of HIPinc's rates for G&A and fringe and comparison with HIPinc's rates.  Copley testified that his rates were not significantly different than HIPinc's rates.  Copley testified that in his opinion HIPinc's G&A expenses were reasonable.

On cross-examination Meikle's attorney asked Copley whether he independently verified whether the amounts charged for G&A were in fact ordinary and necessary business expenses. Copley answered that he used the accounting titles on HIPinc's P&L statements and its tax returns.  Copley could not explain a $70,000 discrepancy between his G&A corporate entry for category 6500, $197,854, and the $119,318 in actual booked expenses provided by Olsen. Copley Dep., p. 75.  Copley explained that using different parameters in QuickBooks such as used by HIPinc can generate different numbers and income statements for a particular department, so for his review he requested complete P&L statements from Olsen.

As for Great Bear's fringe rate, Copley calculated on Schedule 3 of Ex. M a very high salaried fringe benefit rate of 87.30% for 2009.  Schedule 5 shows a salaried fringe rate of 88.43% for 2010.  Copley testified that Olsen told him the high fringe rate was due to changes in employment.  On cross-examination Copley testified that the highest fringe rate he had see prior to HIPinc's was between 35-40%.

---

[24]On cross-examination Copley admitted that at his deposition he could not explain how Olsen derived the formula for calculating HIPinc's G&A rates for 2009 and 2010.  Ex. M, sixth page; Dep. p. 37.  At trial he testified that he reviewed the formula and spoke more with Olsen about the formula and his answer had changed so that now he could describe the formula as a cost approach, derived from a comparison of G&A costs to total expenses.

**Olsen's Bankruptcy Case.**

Olsen filed his voluntary Chapter 13 bankruptcy petition on May 29, 2013.  Meikle did not file a Proof of Claim in Olsen's bankruptcy case.  Debtor's Chapter 13 Plan was confirmed with the Trustee's consent and without objection on December 4, 2013.

Despite not filing a Proof of Claim Meikle commenced this adversary proceeding by filing a complaint on September 9, 2013, seeking exception from Olsen's discharge under §§ 523(a)(2)(A) and 523(a)(6).  Olsen's answer at paragraph 18 states "that there never was any discussion nor agreement to track specific overhead service and expense to the Great Bear Restoration Profit Center . . . ."  Under cross-examination Olsen reiterated that he did not agree with Meikle about the tracking of specific expenses.

## DISCUSSION

Meikle argues that Olsen took Great Bear Restoration's profits in the form of G&A and fringe charges to "doubled down" on HIPinc's other money-losing profit centers and never provided an accounting of all G&A and fringe charges of other profit centers.  Olsen disputes that Great Bear was profitable over several years and contends that Great Bear could not have survived on its own except as a profit center of HIP for 4 of the 5 years in question.

As a preliminary matter this must Court clarify the ownership status of the entity Great Bear Restoration.  Meikle argues that he was a principal in Great Bear Restoration in the business incubator.  He contends:  That Olsen's reference to the incubator and Great Bear Restoration's graduation; that Olsen's reference to a business-within-a-business; Great Bear's name on its own checking account; Rowsey's testimony that there were indicia of ownership; and that Olsen lied to Meikle about his intention regarding their relationship; plus Meikle's "sweat equity" and

39

contribution of knowledge and industry contacts are enough to constitute an ownership interest. In light of Ex. A and 2, this Court finds they are not enough.

Olsen admits that he described Meikle at times as a principal of Great Bear, as he described others, but he argues that Meikle did not contribute any tangible assets to the company and was not an owner and that Great Bear was a profit center within HIPinc. The evidence overwhelmingly supports a finding that Meikle never owned an ownership interest in Great Bear.

Ex. 2 is Meikle's own exhibit. Ex. 2 is a HIPinc job description, signed by Meikle, in which he is referred to alternatively as operations manager/senior restorations ecologist and "employee." Nothing in Ex. 2 gives Meikle an ownership interest in Great Bear Restoration. The agreed facts establish that Olsen is 93% owner of HIPinc. Meikle has no ownership interest in HIPinc. Ex. A reinforces that Great Bear Restoration is an assumed business name of HIPinc.

Meikle refers to Olsen's later statements in promotional flyers referring to him as a principal of Great Bear Restoration and Rowsey's testimony that there were indicia of Meikle's ownership. That evidence is subject to Ex. 2's integration clause which states: "This constitutes the entire agreement and the parties are not relying on verbal discussions or commitments."

In *Richards v. JTL Grp. Inc.*, 2009 MT 173, ¶ 16, 350 Mont. 516, 522, 212 P. 3d 264, the Montana Supreme Court noted that as a general rule Montana's parol evidence rule "precludes the admission of extrinsic evidence of an unambiguous integrated writing in any situation involving parties to the instrument when the rights and duties created by the document are the dispositive issue." *JTL,* at ¶ 16, quoting *In re Marriage of Olson*, 2005 MT 57, ¶ 17, 326 Mont. 224, 108 P.3d 493. The court noted that the intention that a writing represents a final and complete agreement is often expressed as an integration clause. *JTL,* at ¶ 16, quoting *In*

40

*Brimstone Min., Inc. v. Glaus*, 2003 MT 236, ¶ 46, 317 Mont. 236, 77 P.3d 175.  An exception is found at Mont. Code Ann. ("MCA") § 28-2-905(1)(a) when a mistake or imperfection of the writing is put into issue by the parties or when the validity of the agreement is the fact in dispute. In the instant case the writing, Ex. 2, is Meikle's exhibit and he does not contend that Ex. 2 is invalid or argue mistake or imperfection.  The terms of Ex. 2 may be favorable to Olsen, but that is what the parties bargained for.  Therefore, the Court will enforce the integration clause in Ex. 2 and bars extrinsic evidence.

Meikle testified that he was entitled to separate Great Bear Restoration from HIPinc after the graduation, but he admitted that he chose not to at first, because HIPinc took care of administrative tasks.  Rowsey testified that at the beginning Meikle's status was that of an employee of HIPinc and only later statements by Olsen referring to capital and principals demonstrated to her indicia of Meikle's ownership.

The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact – which in a bench trial like the instant is the bankruptcy court.  *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mut. Insur. Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Barry Russell, *Bankruptcy Evidence Manual*, 2013-14 Ed., § 702.2.  The Court gives no weight to Rowsey's opinion that Meikle had an ownership interest in Great Bear Restoration.

Olsen made provisions for Meikle to earn equity in Great Bear Restoration, but the parties never completed an agreement for a transfer of equity as shown by agreed facts 19 and 20. Simply put, Meikle never paid Olsen for any ownership interest in Great Bear Restoration as the parties contemplated and Meikle's "sweat equity" and contributions of knowledge, products and

41

contacts did not entitle him to an ownership interest.

Having concluded that Meikle owned no ownership interest in Great Bear Restoration, the Court turns to Meikle's claims seeking exception from Olsen's discharge.  The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007).  The "fresh start" is explained by the Ninth Circuit Bankruptcy Appellate Panel in *Albarran v. New Forms, Inc. (In re Albarran)*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).
>
> The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)."  *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659.

In a nondischargeability claim the burden of proof falls on the creditor to prove the elements by a preponderance of the evidence.  *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661

(holding that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the "ordinary preponderance-of-the-evidence standard."); *In re Branam*, 226 B.R. 45, 52 (9th Cir. BAP 1998), *aff'd*, 205 F.3d 1350 (9th Cir. 1999).  When applying the preponderance of the evidence standard, "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action."  *Albarran*, 347 B.R. at 379, quoting *Carrilo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002).  Meikle argued at trial that this Court may infer fraudulent and willful and malicious intent from the evidence.  However, in order to give effect the fresh start, exceptions to discharge are strictly construed against an objecting creditor and in favor of the debtor.  *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992); *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983).

### Standard of Conduct for Corporate Officers.

HIPinc is a Delaware corporation, but does business in Montana.  The legal standard of conduct for Olsen as an officer of a business corporation in Montana is set forth in MCA § 35–1–443.[25]

> (1) An officer with discretionary authority shall discharge his duties under
> that authority:
> > (a) in good faith;
> > (b) with the care an ordinarily prudent person in a similar position
> > would exercise under similar circumstances; and

---

[25]Although HIPinc is a foreign corporation authorized to conduct business in Montana, the similar, if not identical, standard of conduct would apply either under Montana law through MCA §§ 35-1-1026(1) and  35-1-1030(2) or under Delaware common law.  *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 705, 708-709 (Del. 2009) (explicitly holding that, officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty); *Graham v. Allis-Chalmers Mfg. Co.*, 41 Del. Ch. 78, 84 (1963).  The parties have not raised any issue as to which law applies in considering standard of conduct.

(c) in a manner the officer reasonably believes to be in the best
interests of the corporation.

Further, so long as an officer meets the provisions of this statute, the
officer will not be held liable for errors in judgment. See 18B Am.Jur.2d
Corporations § 1705.

*Knutson v. Bitterroot Intern. Systems, Inc.*, 2000 MT 203, ¶ 34, 300 Mont. 511, 520-21,  ¶ 34, 5

P.3d 554 (Mont. 2000).

MCA § 35-1-443(4) provides:  "An officer is not liable for any action taken as an officer

or for any failure to take any action if the officer performed the duties of office in compliance

with this section."  MCA § 35-1-443(2) entitles an officer discharging his or her officer's duties

to rely on information and financial data prepared or presented by officers or employees of the

corporation who the officer reasonably believes are to be reliable or competent,  or other persons

as to matters the officer reasonably believes are within the person's professional or expert

competence.  Construing this standard of conduct for corporate officers, the Montana Supreme

Court has written:  "It is too well settled to admit of controversy that ordinarily neither the

directors nor the other officers of a corporation are liable for mere mistake or errors of judgment,

either of law or fact."  *Warren v. Campbell Farming Corp.*, 2011 MT 324, ¶ 22, 361 Mont. 190,

200, ¶ 22, 271 B.3d 36, 43, ¶ 22, quoting *Ski Roundtop, Inc. v. Hall*, 202 Mont. 260, 273, 658

P.2d 1071, 1078 (1983) (internal quotation marks omitted) (quoting *Nursing Home Bldg. Corp.

v. DeHart*, 13 Wash.App. 489, 535 P.2d 137, 143–44 (1975), and W. Fletcher, *Private

Corporations* § 1039, at 621–25 (perm. ed. 1974))."  This deference given to corporate officers

by statute and the Ninth Circuit's admonition in *Riso* that exceptions to discharge are strictly

construed against an objecting creditor and in favor of the debtor, place a heavy burden on

44

Meikle, which the Court concludes he has fallen far short of satisfying.

Meikle contends that Olsen added charges to G&A and fringe against Great Bear Restoration's profit. Olsen contends that the subsequent policy changes were intended to make the policy more detailed and transparent, and that the items which Meikle contends were added had historically been included as indirect expenses in more general categories.

The record contains conflicting expert opinions. Rowsey testified that Olsen's allocation of G&A and fringe against Great Bear Restoration was not proper and not in compliance with GAAP. Copley testified and his report Ex. M states that the G&A and fringe allocations "were properly allocated to Great Bear Restoration profit center." Ex. M, p. 2. In considering the weight to give the parties' experts, the Court notes that Rowsey turned down an offer of complete access to review HIPinc's records and computer system. The Court cannot fathom why she would turn down such an offer while preparing an expert opinion on HIPinc's finances. Copley's opinion came after review of HIPinc's financial records, and the Court assigns greater weight to Copley's opinion based on the breadth of his review in preparation to give an expert opinion.

The Court makes no inference in Meikle's favor based on his argument that Olsen did not comply with discovery requests and did not produce complete P&L statements. Meikle had available the full range of discovery remedies in this adversary proceeding, including the right to request sanctions for failure to cooperate in discovery under Rule 37, Fed. R. Civ. P. (applicable in adversary proceedings under F.R.B.P. Rule 7037). Meikle did not file a Rule 37 motion to compel discovery before trial. Since no order compelling discovery was imposed, at this time after trial is complete, the Court will not hear complaints about failure to respond adequately to discovery requests.

45

As for GAAP, while those accounting principles are "generally accepted" no evidence or case law has been brought to the Court's attention, which provides that failure to comply with GAAP standards is illegal, improper or any basis for an inference of fraudulent intent.  Copley testified that small businesses typically use what parts of GAAP make sense for their business.  HIPinc's promotional materials state that they are in compliance with GAAP and DCAA.  Olsen had a financial incentive to come into compliance with DCAA in order to compete for defense contracts.  The evidence discussed above reflect only a portion of the voluminous financial and accounting records, which were admitted into evidence in this case.

HIPinc was not required to comply with GAAP.  If Meikle had wanted compliance with GAAP, or independent audits, or other safeguards then he should have insisted they be included in Ex. 2.  Instead Meikle signed Ex. 2 accepting employment at HIPinc as Great Bear Restoration's operations manager/senior restoration ecologist.  Ex. 2 does not require compliance with GAAP.  Rather Ex. 2 states:  "HIPinc accounting practices will be used" in computing bonus and profit sharing.  Further, Ex. 2 specifically states that Meikle's bonus and profit sharing, as a percentage of pay, is "at the discretion of the President of HIPinc."  The Court agrees that these provisions of Ex. 2 give Olsen, as president of HIPinc, a great deal of discretion in determining Meikle's bonus and profit sharing and HIPinc's accounting practices.  But that is what Meikle bargained for when he signed Ex. 2.

Meikle contends that Olsen's changes in HIPinc policies increasing the G&A items charged give rise to his claims for nondischargeability.  The evidence shows that Olsen regularly issued new policies, but there is nothing under Montana law limiting a corporate president from making policy changes in good faith if he or she reasonably believes them to be in the best

46

interests of the corporation. § 35-1-443(1).  Ex. 2, which Meikle bargained for and signed, states

that his "Specific Duties" include "Comply with HIPinc policies."  Ex. 2 did not include

restrictions to Olsen's authority to make policies, so Meikle's options were to "comply with

HIPinc policies" or give notice of intent to terminate the employment relationship.

### § 523(a)(2).

Meikle's first claim for relief seeks exception from discharge under § 523(a)(2).  Section

523(a)(2)(A) provides that, "a discharge under . . . this title does not discharge an individual

debtor from any debt – (2) for money, property, services, or an extension, renewal, or refinancing

of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud

. . . ."  *See Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).  To prevail

on a § 523(a)(2)(A) claim, a creditor must establish five elements:  (1) that the debtor made

material misrepresentations, fraudulent omission or deceptive conduct; (2) that the debtor knew

the misrepresentations or conduct were false at the time they were made; (3) that the debtor made

the misrepresentations, omissions or conduct with the intent to deceive the creditor; (4) that the

creditor justifiably relied on the misrepresentations or conduct; and (5) that damage to the

creditor was proximately caused by the creditor's reliance on the debtor's statement or conduct.

*Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (9th Cir. BAP 2009) (*quoting Turtle Rock*

*Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

The creditor bears the burden of proof to establish all five of these elements by a preponderance

of the evidence.  *Weinberg*, 410 B.R. at 35; *Slyman*, 234 F.3d at 1085.

### 1.  Material misrepresentations, fraudulent omission or deceptive conduct.

Meikle contends that Olsen represented to him that Meikle was a principal of Great Bear,

not merely an employee, based on the incubator relationship and Great Bear's post-graduate status in 2008.  Meikle further contends that Olsen's representations about bonus and profit sharing were false because it was not Olsen's practice to track direct fringe expenses to particular profit centers, as expressly stated in Ex. 2, and that Olsen never represented to Meikle that Great Bear would have to pay for G&A and fringe benefits of Olsen's failing profit centers.

Olsen argues that Meikle failed to sustain his burden under § 523(a)(2).  Olsen denies that his representations were false, because Meikle entered into the employment agreement in Ex. 2 and was not a principal.  Olsen argues that Ex. 2 is the entire agreement and includes the integration clause that the parties are not relying on verbal discussions or commitments.

In his reply brief Meikle argues that Olsen admits that extrinsic evidence is required to understand the agreement because he testified that Meikle would have to refer to the policy manuals in order to understand the agreement.  Olsen argues that Meikle saw Ex. J and Ex. 32, and quarterly rate letters (Ex. 29, 30, 47, 48, 49) and was aware of how G&A and fringe were allocated and that Ex. 2 provides specifically that "HIPinc accounting practices will be used."

Meikle refers to other alleged false statements by Olsen regarding HIPinc's 2007 sales and Olsen's answer claiming he did not know that Great Bear had lost money until the end of 2007, compared to statements in a flyer in January 2010.  Olsen argues that Great Bear was not profitable for several years because of accounting errors, underbidding of contracts by Meikle and premature billings.  Olsen admits that he was wrong in Ex. 43 in January 2011 when he stated that HIPinc complied with GAAP, but he argues that Meikle could not have relied on that statement 5 years earlier.  He submits that his mistaken belief that HIPinc complied with GAAP and DCAA does not show fraud in 2006.  Meikle argues that HIPinc never was GAAP compliant

48

and that Olsen continued to alter policies into late 2010 adding extra charges to pay for money-losing profit centers.

These contentions are discussed above.  The Court enforces the integration agreement in Ex. 2 signed by Meikle which provides:  "This constitutes the entire agreement and the parties are not relying on verbal discussions or commitments." *JTL*, 2009 MT 173, ¶ 16.  Ex. 2 provides for HIPinc's accounting practices to be used, as developed and subject to Olsen's authority as HIPinc's president and for Meikle to comply with HIPinc policies also as established by Olsen.

### 2.  Whether Debtor knew the misrepresentations or conduct were false at the time they were made.

Meikle contends that Olsen's representations about bonus and profit sharing were false because it was not Olsen's practice to track direct fringe expenses to particular profit centers, as expressly stated in Ex. 2.  Olsen argues that at the time of Ex. 2 Great Bear Restoration was not a profitable business and therefore his statements in Ex. 2 about "direct fringe benefits" were not false at the time they were made.

On this second element, this Court concludes that Meikle failed to satisfy his burden to overcome the presumption in favor of discharge.  The only relevant representations are in Ex. 2, as limited by the integration clause.  As HIPinc's president Olsen had the authority over HIPinc's accounting practices, policies and under Ex. 2, Olsen had the specific discretion over Meikle's bonus and profit sharing.  No evidence exists in the record showing that Olsen knew his representations or conduct in Ex 2 were false at the time they were made.

The evidence includes Olsen's testimony that HIPinc paid Meikle a $10,000 bonus from profits made by a different profit center for the year 2007.  The evidence also shows that Great

49

Bear's fringe benefits to its employees, authorized by Olsen, were generous.  Finally, the evidence shows that Olsen remained willing to transfer ownership interests in Great Bear Restoration to Meikle in return for payment, even after Meikle gave Olsen Ex. 17.

### 3. Whether Debtor made the misrepresentations, omissions or conduct with the intent to deceive Meikle.

Meikle asks the Court to infer Olsen's bad faith and intent to defraud based on the totality of the circumstances shown by the evidence.  Meikle argues that Olsen always intended for Great Bear Restoration to pay for all of HIPinc's G&A and fringe and that Olsen used false and misleading representations to induce Meikle to believe that Great Bear would only be charged for its fair share of G&A and the expenses it incurred.  Meikle contends that Olsen expanded G&A charges unilaterally without consulting Meikle, to add items to support Olsen and his "pet projects" at Meikle's expense.  Olsen denies having fraudulent intent and argues that Ex. 2 is the only agreement between them, no separate incubation agreement exists and that Meikle's dispute about a contract provision does not satisfy the requirement for fraud.

Meikle refers to Olsen's statements in HIPinc's publications that it complied with GAAP and DCAA as false, based on Rowsey's expert testimony that HIPinc did not comply with GAAP or DCAA.  Meikle argues that Olsen's fraudulent and deceptive conduct continued for many years, especially from 2009-2010 when Olsen lied to and deceived Meikle about the fact that Olsen was overcharging Great Bear Restoration to pay for the fringe and overhead of HIPinc's other profit centers.  Meikle further described Olsen as secretive based on his discontinuing meetings when his investments in Montana Made Batik were questioned and his preventing Boland's access to the server.

50

Olsen argues that HIPinc amended its financial policies after Meikle began his employment in order to comply with DCAA standards, which required substantial changes in the way HIPinc allocated G&A and fringe.  Olsen contends that HIPinc's financial policies were readily available to Meikle and Boland on the computer server, but Meikle chose not to review them and instead accepted and participated in the evolution of financial policies and profit sharing.  Meikle describes that contention as a distraction and argues Olsen produced no evidence that Meikle could have come to HIPinc and examine its computers.

The Court finds and concludes that Meikle failed to satisfy the third element to show that Olsen made misrepresentations, omissions or conduct with the intent to deceive Meikle.  The contentions have been addressed above.  Ex. 2's integration clause provides that the parties are not relying on verbal discussions or commitments.  Ex. 2 provides that HIPinc accounting practices will be used and that Olsen has discretion over Meikle's bonus and profit sharing.  Olsen had authority and discretion as HIPinc's president to formulate and amend HIPinc's policies and accounting practices.  The evidence shows that Meikle and Boland had continuous access to HIPinc's computer and QuickBooks.

### 4.  Whether Meikle justifiably relied on the misrepresentations or conduct.

Meikle argues that his compensation was directly tied to the performance of the Great Bear profit center, that Ex. 2 provides for how he would be paid and that it was his understanding as to how the business incubator would work.  Therefore, he suggests, his reliance on Olsen's misrepresentations or conduct was justifiable.

Olsen argues that Meikle knew or should have known from reading Ex. 32, "Policy 200," at the time he signed Ex. 2, that HIPinc allocated fringe benefits as an indirect cost as a rate to

51

profit centers.  Olsen argues that Meikle accepted the pooling of employee benefits and allocation of those benefits as indirect costs, which was done for DCAA compliance, while Great Bear Restoration was losing money and being subsidized by other profit centers.  Olsen submits that HIPinc's financial policy governing allocation of indirect expenses and employee benefits was a legitimate business accounting decision, which was fully disclosed and available to Meikle at all times.

The Court finds and concludes that Meikle failed to satisfy the fourth element to show justifiable reliance on misrepresentations or conduct.  The Court previously concluded in this decision that Meikle failed to show misrepresentations, omissions or deceptive conduct by Olsen, or that Olsen knew they were false at the time they were made or that Olsen made the representations with intent to deceive.  Those elements having not been shown, it follows no justifiable reliance occurred based on misrepresentations or conduct.

**5.  Whether damage to Meikle was proximately caused by Olsen's statements or conduct.**

Meikle argues that he never would have entered into Olsen's incubator but for Olsen's false and intentionally deceptive representation about his method of tracking costs to the Great Bear profit center.  Olsen responds that at worst Ex. 2 is an ambiguous contract that Meikle now tries to turn into fraud.

Meikle argues that his damages total either $389,169.29 for 2009 and 2010 overcharges to G&A and fringe plus pre-judgment interest, as shown by Ex. 37 based on a 5% G&A rate, or alternatively, Rowsey's calculation of damages for lost profits ranging from $210,205 and $630,614, plus prejudgment interest as shown in Ex. 40.  Meikle bases these calculations based

52

upon what Olsen charged Great Bear Restoration for all of HIPinc's fringe and G&A in 2009 and 2010.

Meikle contends that Boland's calculations on Ex. 20 and 23 confirm the reasonableness of Rowsey's figures. Olsen challenges Boland as not an expert and that her analysis was not guided by any financial policy. Olsen challenges Rowsey's expert opinion because she relied on Boland's opinion and because Rowsey also did not apply HIPinc's financial policy to the expenses in Boland's report.

Olsen further notes that Meikle did not file a Proof of Claim in his Chapter 13 case and that his damage claim has three flaws. First, Olsen argues that Meikle failed to show that any damage was caused by the claimed fraud or by his entering into a separate incubation arrangement. Second, Olsen argues that the damages calculated by Rowsey, Boland and Meikle vary so much that they are speculative. Olsen claims that he offered Meikle free access to HIPinc's financial records, but that Meikle chose not to review them. Third, Olsen argues that each of Meikle's damage calculations is flawed, and that it is just as likely that Great Bear Restoration consumed more G&A and fringe when it was not profitable, as was assessed against it when it was profitable.

Since the Court previously found in this decision that Meikle failed to satisfy his burden to show the first four elements under § 523(a)(2), the Court need not decide the fifth element. The Court finds that Meikle failed to overcome the strict construction in favor of discharge under § 523(a)(2). *Riso*, 978 F.2d at 1154.

### § 523(a)(6).

Meikle's second claim for relief seeks exception from Olsen's discharge under §

53

523(a)(6).  Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  *Barboza v. New Form Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,1205 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001).

The Ninth Circuit has held that when an "intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)."  *In re Diamond*, 285 F.3d 822, 828 (9th Cir. 2002), quoting *Jercich*, 238 F.3d at 1205.  The Ninth Circuit requires a separate analysis for both the "willful" and "malicious" prongs.  *Barboza*, 545 F.3d at 711; *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, at 1144 *Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991) (per curiam); *Jercich*, 238 F.3d at 1209.

This Court must analyze the willful and malicious prongs of § 523(a)(6) separately in compliance with *Barboza*, *Sicroff*, *Jercich* and *Su*.  The creditor must prove that the debtor's conduct in causing the injuries was both willful and malicious.  *Barboza*, 545 F.3d at 711 (supporting the two-prong test set forth in *Su*).

As to his personal liability, Olsen asserts that he is not personally liable for Meikle's claims against his employer, HIPinc, a corporation and separate legal entity, and that Meikle has not attempted to pierce HIPinc's corporate veil.  In his reply brief Meikle argues that Olsen is personally liable because he listed Michael as having an unsecured claim in his Schedules.[26]  As

---

[26]The claims bar date has expired in Olsen's Chapter 13 case.  Since Meikle did not file a proof of claim as required under 11 U.S.C. § 502(a), he does not have an allowed claim.  While 11 U.S.C. § 1111(a) provides that a proof of claim is deemed filed for any claim that appears in schedules filed in a Chapter 11 case, that section does not apply in a Chapter 13 case; no equivalent section exists under Chapter 13 of the Code.

for piercing the corporate veil, Meikle argues that he has satisfied the burden to pierce the corporate veil.[27]

### 1. Willful.

Willfulness requires proof that the debtor deliberately or intentionally injured the creditor or the creditor's property and that in doing so, the debtor intended the consequences of his act, not just the act itself. *Su*, 290 F.3d at 1143. The debtor must act with a subjective motive to inflict injury or with a belief that injury is substantially certain to result from the conduct. *Id*. at 1142. Injuries resulting from recklessness are not sufficient to be considered willful injuries for exception for discharge under § 523(a)(6). *Barboza*, 548 F.3d at 708, citing *Kawaauhau v. Geiger*, 523 U.S. 57, 60-61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

Meikle contends that his injury was intentional because Olsen knew what he was doing and knew that by his false representations and cover up of overcharges to G&A and fringe that he was causing Meikle injury, even while Meikle objected and repeated requests for an accounting of the G&A and fringe. Olsen argues that Meikle has not satisfied his burden under 523(a)(6). The Court agrees and finds that Meikle has failed to show that Olsen acted with a subjective motive to inflict injury on Meikle or with a belief that injury to Meikle was substantially certain to result from the conduct.

The evidence shows that Olsen courted Meikle and ultimately offered him $50,000 plus a bonus and profit sharing to be employed at HIPinc. Olsen paid Meikle a bonus and tried to

---

[27]The Court herein does not consider and does not decide Meikle's veil piercing arguments. No specific claim to pierce the corporate veil was pleaded in Meikle's complaint. Veil piercing was not set forth in the liability or relief sought sections of the agreed Final Pretrial Order. No such claim has been placed before the Court in accordance with proper procedure.

incubate Meikle to realize his dream to own his own company.  Meikle's conduct in attempting

to terminate HIPinc by Ex. 17 precipitated a change of events that prompted Olsen to oust

Meikle, which prevented the parties from pursuing binding arbitration or mediation.

   In concluding that a debtor did not willfully injure, the bankruptcy court in Idaho wrote

that, "particularly when relying solely on circumstantial evidence":

> It is not enough that a debtor's actions result in a high degree of risk or injury to
> others, or even that there is a high probability that injury will result. [*Su*, 290 F.3d]
> at 1145-46 n.4.  Instead, to justify an exception to discharge, the creditor must, at
> a minimum prove that the debtor subjectively knew to a substantial certainty that
> injury would result from her actions.  *Id.*, at 1145-46.

*Masuo and Becker v. Galan (In re Galan)*, 455 B.R. 214, 222 (Bankr. D. Idaho 2011).

   Meikle's alleged injury is the loss of bonus, profit sharing and his aspiration to own his

own company, as a result of Olsen's decisions regarding HIPinc's policies and accounting

practices.  Montana law and Ex. 2 gave Olsen great authority, deference and discretion in

formulating corporate policies, accounting practices and ultimately the amount of Olsen's bonus

and profit sharing.  Olsen's decisions regarding allocation of G&A and fringe to the Great Bear

Restoration profit center, at a time when HIPinc's other profit centers were not making any

profit, were within Olsen's authority and discretion.  Olsen made those decisions trying to keep

HIPinc from becoming insolvent.  Olsen's actions and Meikle's alleged "injury" in the form of

loss of bonus and profit sharing are not are not proof, in this Court's opinion, that Olsen

subjectively knew to a substantial certainty that injury to Meikle would result from Olsen's

actions.

### 2. Malicious

   For conduct to be malicious, the creditor must prove that the debtor:  (1) committed a

56

wrongful act; (2) done intentionally; (3) which necessarily caused injury; and (4) was done without just cause or excuse. *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010); *Su*, 290 F.3d at 1146-47.

Meikle contends that his injury was malicious because it was done in a conscious disregard of Olsen's duties and without just cause or excuse. Meikle argues that Olsen should have leveled with him, honored the representations, cut Great Bear loose and not asked Meikle to bear Olson's losses. Instead, Meikle contends, Olsen continued to cover up his conduct because he never intended to honor his representations and maliciously caused Meikle injury.

Olsen responds that he was willing to transfer Great Bear to Meikle if he paid HIPinc for it, but Meikle did not ever pay for it in 2006, 2007 or at the mediation in 2011. Olsen contends that he did not intend to cause Meikle injury, did not cause Meikle injury and did not commit a wrongful act causing injury to Meikle without just cause or excuse.

The Court finds and concludes that Meikle failed to satisfy his burden to prove each of the four elements required to find malicious injury. Meikle failed to show that Olsen committed a wrongful act because Olsen acted within his authority under Montana law as a corporate president and under his discretion agreed to in Ex. 2. Therefore Meikle failed to prove that Olsen intentionally committed wrongful acts.

The Court finds that Meikle failed to satisfy his burden to show a wrongful act by Olsen, which necessarily caused Olsen's injury. Instead of seeking binding arbitration as provided in Ex. 2 to resolve his dispute over G&A and fringe costs, Meikle attempted to unilaterally terminate HIPinc's position at Great Bear. In this Court's review of the facts, this attempted unilateral termination, more than any act by Olsen, contributed to whatever alleged injury Meikle

may have incurred.

The fourth element is whether debtor's acts were done without just cause or excuse. The record should reflect that Olsen's actions in the period in question, during which he shepherded HIPinc's resources and used Great Bear Restoration's revenues to keep HIPinc afloat and solvent, took place while the community, most of the State of Montana and the country were in the throes of the "Great Recession." Olsen was described at trial as rude, defiant, intimidating and disrespectful. His management style also could be described as abrupt, uncooperative, and condescending. Notwithstanding, it is clear to the Court, if not to Meikle, that Olsen's actions in paying the G&A and fringe for all HIPinc's profit centers and keeping the corporation afloat, instead of paying Meikle a bonus and profit sharing and letting the entire company become insolvent, were done with just cause and excuse.

In sum, the Court finds and concludes that Meikle failed to show both requirements under § 523(a)(6) for willful and malicious injury by the Debtor.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this cause under 28 U.S.C. § 1334.

2. Meikle's claims for relief are core proceedings to determine dischargeability of Meikle's particular debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. §§ 523(a)(2) and 523(a)(6), which are construed liberally and in favor of the Debtor's discharge and fresh start and against the objecting party.

3. The Plaintiff failed to satisfy his burden of proof by a preponderance of the evidence with respect to his claim for exception of his claim from Defendant's discharge under § 523(a)(2) for false pretenses, false representation or actual fraud.

58

4.  The Plaintiff failed to satisfy his burden of proof by a preponderance of the evidence with respect to his claim for exception of his claim from Defendant's discharge under § 523(a)(6) for willful and malicious injury to Plaintiff or his property.

**IT IS ORDERED** a separate Judgment shall be entered in favor of the Defendant/Debtor James Richard Olsen and against Plaintiff Tim Meikle, and dismissing Plaintiff's complaint filed in this adversary proceeding.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana